UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| **SANDRIDGE EXPLORATION AND PRODUCTION LLC,** | § § § | |
| **Plaintiff,** | § | |
| VS. | § | **CIVIL ACTION NO. 4:15-CV-2103** |
| | § | |
| **OXY USA INC,** | § § | |
| **Defendant.** | § | |

## MEMORANDUM AND ORDER

Before the Court is the motion to dismiss filed by Defendant Oxy USA Inc. (Doc. No. 10.) Having considered the pleadings, motion, response, reply, and applicable law, the Court finds that the motion should be granted.

### I. BACKGROUND

The following facts are drawn from "the complaint, its proper attachments, 'documents incorporated into the complaint by reference, and matters of which a court may take judicial notice.'" *Randall D. Wolcott, M.D., P.A. v. Sebelius*, 635 F.3d 757, 763 (5th Cir. 2011). For purposes of deciding this motion, the Court "accept[s] as true the well-pleaded factual allegations in the complaint." *Cuvillier v. Taylor*, 503 F.3d 397, 401 (5th Cir. 2007) (quoting *Causey v. Sewell Cadillac-Chevrolet, Inc.*, 394 F.3d 285, 288 (5th Cir. 2004)).[1]

SandRidge and Oxy are oil and natural gas companies. SandRidge primarily focuses on "exploration and production activities in the Mid-Continent region of the United States." (Doc. No. 2 ¶ 6.) Oxy engages in the "exploration, production, and marketing of crude oil and natural gas." (*Id.* ¶ 7) In June 2008, they entered into two agreements. (*Id.* ¶ 8.) The Construction

---

[1] The Court will not consider the affidavit of Kevin White attached to SandRidge's response because it is outside of the pleadings.

Management Agreement concerned the design and construction of a gas treating plant, carbon dioxide ("CO2") compression, and associated pipelines in West Texas. SandRidge agreed to build the plant, called the Century Plant, which Oxy would own and operate. Second, the Gas Treating and CO2 Delivery Agreement (the "GTA") dealt with the delivery and taking of carbon dioxide. SandRidge would "drill, produce, and deliver high CO2 gas" to the plant, and Oxy would operate the plant for thirty years. (*Id.*) In addition, SandRidge would retain all the methane gas, and Oxy would retain "all captured CO2 for use in tertiary oil recovery in West Texas." (*Id.*)

At issue in this case is Article VIII of the GTA. That article is entitled "Carbon Credits and Incremental Costs" and provides that "[SandRidge] and Oxy shall each comply with, and cause their Affiliates to comply with, their respective obligations pursuant to Exhibit C." (*Id.*, Ex. 1 at 39.) Exhibit C, in turn, provides:

The Parties acknowledge that the status of Applicable Laws governing greenhouse gas emissions and climate change legislation (collectively, "GHG Legislation"), and the suitability of the Century Facilities for available voluntary programs for the procurement and/or allocation of credits, offsets, allowances, voluntary carbon reductions and comparable benefits, instruments or assets relating to the avoidance of CO2 emissions ("Voluntary Carbon Credit Programs"), are difficult to determine at this time. At an appropriate time after the Effective Date, the Parties will enter into a more detailed written agreement setting forth their respective rights and obligations with respect to GHG Legislation and Voluntary Carbon Credit Programs, which agreement shall reflect the following terms:

(a) Any benefits or costs related to GHG Legislation (including any compliance costs and obligation with respect to such GHG Legislation) relating to the operation of the Century Facilities related to [SandRidge] Gas and any CO2 resulting from the treatment of [SandRidge] Gas will be allocated seventy-five percent (75%) to [SandRidge] and twenty-five percent (25%) to Oxy;

(b) Any benefits or costs related to GHG Legislation (including any compliance costs and obligation with respect to such GHG Legislation) relating to Residue Gas and Century Plant Products resulting from the treatment of [SandRidge] Gas will be allocated solely to [SandRidge]; and

(c) Any benefits or costs related to any Voluntary Carbon Credit Program resulting from the operation of the Century Facilities related to [SandRidge] Gas and any CO2 resulting from the treatment of [SandRidge] Gas will be allocated seventy-

five percent (75%) to [SandRidge] and twenty-five percent (25%) to Oxy.

(*Id.* Ex. 1 at Ex. C.)

In October 2008, Congress enacted the Energy Improvement and Extension Act of 2008. (*Id.*, Ex. 2.) This legislation included Internal Revenue Code Section 45Q – Credit for Carbon Dioxide Sequestration. (*Id.* ¶ 3.); 26 U.S.C.A. § 45Q (West 2014). Section 45Q permits an eligible taxpayer to claim a carbon dioxide sequestration credit of "$10 per metric ton of qualified carbon dioxide which is—(A) captured by the taxpayer at a qualified facility, (B) used by the taxpayer as a tertiary injectant in a qualified enhanced oil or natural gas recovery project, and (C) disposed of by the taxpayer in secure geological storage." 26 U.S.C.A. § 45Q(a)(2). A "qualified facility" is "any industrial facility—(1) which is owned by the taxpayer, (2) at which carbon capture equipment is placed in service, and (3) which captures not less than 500,000 metric tons of carbon dioxide during the taxable year." *Id.* § 45Q(c). Under these eligibility requirements, only Oxy—and not SandRidge—may claim the Section 45Q credit. (Doc. No. 2 ¶ 22.)

On August 2, 2010, SandRidge sent a letter to Oxy about the GTA. (*Id.*, Ex. 2.) SandRidge said that the Energy Improvement and Extension Act of 2008 "falls within the GHG Legislation as contemplated by Exhibit C." (*Id.*, Ex. 2 at 2.) It further explained SandRidge's view that the Section 45Q tax credit "is worth $10 per ton of sequestered CO2, . . . of which SandRidge is entitled to 75% pursuant to Exhibit C of the GTA." (*Id.*) Enclosed with this letter was SandRidge's "First Supplemental Agreement," an initial draft of the detailed written agreement contemplated by Exhibit C. (*Id.*) SandRidge had provided this draft to Oxy in November 2008, but Oxy had not responded in writing.

Oxy responded by letter dated August 16, 2010. Oxy stated its position that the Energy Improvement and Extension Act of 2008 was not "GHG Legislation" as that term is used in

3

Exhibit C because Congress had not passed any climate legislation. (*Id.*, Ex. 3 at 1.) Oxy also said that Section 45Q

> specifies certain criteria to qualify for CO2 EOR tax credits and terminates in the calendar year following the year in which cumulative credits for 75 million metric tons have been qualified. Should it appear that the Century Plant would qualify for 45Q credits in which Sand[R]idge is entitled to participate in accordance with the Parties['] intent in Exhibit C, at that time [Oxy] will discuss with Sand[R]idge an appropriate agreement.

(*Id.*, Ex. 3 at 2.)

In January 2012, SandRidge sent another letter to Oxy. This letter informed Oxy that SandRidge had been able to claim the Section 45Q tax credit for CO2 sequestration for two other plants. It also expressed SandRidge's view that Oxy "will be able to claim a 45Q credit in excess of $22 million for 2011 with respect to [the] Century [Plant], which would be shared 25% by [Oxy] and 75% by SandRidge." (*Id.*, Ex. 4 at 1.) SandRidge further noted that "now would be an appropriate time to document the intent of Exhibit C to the [GTA]" and enclosed another proposed "First Supplemental Agreement." (*Id.*) Oxy did not respond. In October 2012, "SandRidge sent a draft of a fully termed CO2 Cost Sharing Agreement to Oxy." (*Id.* ¶ 19.)

In February 2013, SandRidge emailed Oxy "supporting documentation for the amount SandRidge claims it should receive from Oxy for SandRidge's allocated portion of tax credits under Section 45Q." (*Id.*, Ex. 5 at 2.) In March 2013, Oxy responded that its "position is that Exhibit C was always intended to deal with greenhouse gas credits and carbon credits, but not tax credits." (*Id.*, Ex. 5 at 1.) Oxy gave three reasons for its position. First, Article VII of the GTA, not Article VIII, dealt with taxes and required each party to bear the burden of its own taxes. Therefore, each party also should receive the benefit of tax credits. Second, Exhibit C entitles SandRidge to a share in benefits or credits that "result from the operation of the Century Facilities." (*Id.*) However, Section 45Q results from "Oxy's use of the CO2 in Oxy's enhanced

4

oil recovery operations" at its enhanced oil recovery ("EOR") facilities. To share the tax credit arising from these operations would also require SandRidge to bear the cost of operating the EOR facilities. (*Id.*) Finally, Oxy said that Section 45Q does not qualify as "GHG Legislation" or "Voluntary Carbon Credit Program" as that term is used in Exhibit C.

That same day, SandRidge replied, expressing its disagreement. SandRidge said that Oxy's response was "in stark contrast to Oxy's earlier position that SandRidge is entitled to participate in these credits if Century Plant qualifies under Section 45Q." (*Id.*, Ex. 5 at 2.) SandRidge reiterated its position that "the Section 45Q tax credits fall within the scope of benefits related to GHG Legislation contemplated by Exhibit C." (*Id.*) From 2011 to 2015, Oxy did not claim the Section 45Q tax credit. (*Id.* ¶ 23.)

In July 2015, SandRidge filed its complaint against Oxy. SandRidge alleges that Oxy breached the GTA by not sharing 75% of the Section 45Q tax credit with SandRidge and not entering into a more detailed agreement.[2]

## II. LEGAL STANDARDS

A court may dismiss an action for "failure to state a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6). "To survive a Rule 12(b)(6) motion to dismiss, a complaint 'does not need detailed factual allegations,' but must provide the plaintiff's grounds for entitlement to relief—including factual allegations that when assumed to be true 'raise a right to relief above the speculative level.'" *Cuvillier*, 503 F.3d at 401 (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007)). That is, a complaint "must contain sufficient factual matter, accepted

---

[2] SandRidge also alleges a claim for declaratory judgment. This claim relates to the parties' proceedings before an expert on three specific disputes that are distinct from SandRidge's breach-of-contract claims. Oxy's motion to dismiss requests that the Court abstain from deciding this claim because of a pending state court proceeding. In its response to Oxy's motion to dismiss, SandRidge "agrees that permissive abstention [of its declaratory judgment claim] is appropriate and would promote judicial economy." (Doc. No. 18 at 22.) Accordingly, Oxy's motion to dismiss the declaratory judgment claim will be granted.

as true, to 'state a claim to relief that is plausible on its face.'" *Gonzalez v. Kay*, 577 F.3d 600, 605 (5th Cir. 2009) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* (quoting *Ashcroft*, 556 U.S. at 678).

"In general, a contract is legally binding only if its terms are sufficiently definite to enable a court to understand the parties' obligations." *Fort Worth Indep. Sch. Dist. v. City of Fort Worth*, 22 S.W.3d 831, 846 (Tex. 2000). "Courts [in Texas] have long held that an agreement to enter into negotiations in the future is unenforceable." *Maranatha Temple, Inc. v. Enter. Prods. Co.*, 893 S.W.2d 92, 104 (Tex. App.—Houston [1st Dist.] 1994, writ denied). This type of agreement "cannot be enforced because the court has no means to determine what sort of contract the negotiations would have produced." *McCurry v. Aetna Cas. & Sur. Co.*, 742 S.W.2d 863, 866 (Tex. App.—Corpus Christi 1987, writ denied). However, "[a]greements to enter into future contracts are enforceable if they contain all material terms." *McCalla v. Baker's Campground, Inc.*, 416 S.W.3d 416, 418 (Tex. 2013).

Material or "[e]ssential terms are those terms that the parties 'would reasonably regard as vitally important elements of their bargain.'" *Gen. Metal Fabricating Corp. v. Stergiou*, 438 S.W.3d 737, 744 (Tex. App.—Houston [1st Dist.] 2014, no pet.) (quoting *Potcinske v. McDonald Prop. Invs., Ltd.*, 245 S.W.3d 526, 531 (Tex. App.—Houston [1st Dist.] 2007, no pet.)). The essential terms of an agreement are determined on a case-by-case basis. *T.O. Stanley Boot Co. v. Bank of El Paso*, 847 S.W.2d 218, 221 (Tex. 1992). Whether an agreement contains all essential terms is a question of law. *McCalla*, 416 S.W.3d at 418. However, determining whether a particular term is essential to the parties' agreement may involve a subsidiary question of fact. *See Neeley v. Bankers Trust Co. of Texas*, 757 F.2d 621, 626 (5th Cir. 1985) ("A finding

of essentiality reflects a conclusion of law, but . . . it rests in part on a factual finding as to the parties' subjective evaluation of the importance of the indefinite terms.").

A valid contract also requires that "the parties intended to be bound by the written agreement" rather than "intended the agreement to be preliminary and without legal significance." *W. Beach Marina, Ltd. v. Erdeljac*, 94 S.W.3d 248, 257 (Tex. App.—Austin 2002, no pet.). This is typically a question of fact. *Id.*; *Gen. Metal Fabricating Corp.*, 438 S.W. 3d at 748–50. Similarly, when the parties' agreement states that a more formal document will follow, it is usually a question of fact as to whether "the contemplated formal document [is] a condition precedent to the formation of a contract or merely a memorial of an already enforceable contract." *Foreca, S.A. v. GRD Dev. Co.*, 758 S.W.2d 744, 745–46 (Tex. 1988).

"[W]hether a contract is ambiguous is a question of law to be decided by the [c]ourt." *Progressive Cnty. Mut. Ins. Co. v. Kelley*, 284 S.W.3d 805, 808 (Tex. 2009). If the court finds the contract to be ambiguous, the meaning should be resolved by the fact finder. *Id.*

### III. ANALYSIS

Oxy argues that SandRidge's complaint fails to state a claim for breach of contract. In particular, Oxy contends that Exhibit C is an unenforceable agreement to negotiate based on its plain language and the further negotiations between the parties. In addition, Oxy argues that Exhibit C is unenforceable because it omits certain essential terms. Oxy points to three missing terms: (1) whether Oxy must use the Century Plant CO2 for enhanced oil recovery; (2) what happens if Oxy declines to claim the credit; and (3) which costs are subject to the 75%/25% split.

SandRidge offers several responses. SandRidge explains how the language of Exhibit C and the parties' conduct demonstrate their intent to be bound. SandRidge further argues that Exhibit C is enforceable because the passage of GHG Legislation and applicability of Voluntary Carbon Credit Programs were conditions precedent beyond the parties' control. Finally,

SandRidge asserts that Exhibit C contains all essential terms and that any missing terms are collateral or obviously implied.

### A. Agreement to Negotiate

To the extent that SandRidge's complaint alleges a stand-alone claim against Oxy for not entering into a more detailed written agreement, Oxy's motion to dismiss is granted. Exhibit C states the parties' agreement to "enter into a more detailed written agreement." (Doc. No. 1, Ex. 2 at Ex. C.). By itself, this is nothing more than an agreement to agree, which is unenforceable under Texas law. *See Maranatha Temple*, 893 S.W.2d at 104. The Court has no way of determining what obligations the more detailed agreement would have imposed. As such, it cannot be enforced. Therefore, Oxy's failure to enter into a more detailed agreement cannot form the basis of a breach-of-contract claim.

However, that SandRidge and Oxy contemplated the execution of a more formal and thorough written document does not necessarily mean that Exhibit C is unenforceable. This is so because "parties may agree on some terms sufficient to create a contract, leaving other provisions for later negotiation." *Crisp Analytical Lab, L.L.C. v. Jakalam Properties, Ltd.*, 422 S.W.3d 85, 89 (Tex. App.—Dallas 2014, pet. denied). For that to have occurred here, the terms present in Exhibit C must be sufficient to create a binding, enforceable contract. To that end, SandRidge alleges that Exhibit C contains all essential terms. (Doc. No. 2 ¶ 27.) Because essentiality is ultimately a question of law, the Court does not need to take SandRidge's allegation as true and now turns to its evaluation of that issue. *See Twombly*, 550 U.S. at 554 (noting that courts "are not bound to accept as true a legal conclusion couched as a factual allegation") (quoting *Papasan v. Allain*, 478 U.S. 265, 286 (1986)).

### B. Essential Terms

Regarding SandRidge's claim that Oxy breached Exhibit C by not sharing the value of

8

the Section 45Q tax credit, Oxy's motion to dismiss is also granted. For purposes of this motion, the Court will assume that "GHG Legislation" encompasses Section 45Q. "GHG Legislation" is not defined in the GTA, but the meaning of an ambiguous term should be resolved by a fact finder, not against the non-moving party at the motion-to-dismiss stage. *See Progressive Cnty. Mut. Ins. Co.*, 284 S.W.3d at 808. Additionally, the Court will assume that the parties intended to be bound by Exhibit C. Again, resolving this issue against SandRidge at this early stage would be inappropriate. *See Highland Capital Mgmt., L.P. v. Bank of Am., Nat. Ass'n*, 698 F.3d 202, 209–10 (5th Cir. 2012).

Proceeding on those assumptions, the Court finds that Exhibit C omits two essential terms. First, the GTA does not impose any obligation on Oxy to use the Century Plant CO2 for enhanced oil recovery, a necessary condition to receive the Section 45Q credit. Although SandRidge's complaint alleges that Oxy would retain "all captured CO2 for use in tertiary oil recovery in West Texas," (Doc. No. 2 ¶ 8), the GTA itself, attached to SandRidge's complaint, makes no mention of how Oxy will use the CO2. The GTA states that "CO2 resulting from the treating of [SandRidge] Gas shall be retained by Oxy. Title to such CO2 shall vest in Oxy at the time the CO2 is separated from the [SandRidge] Gas stream . . . ." (Doc. No. 2, Ex. 1 at 18.) The GTA is silent on what Oxy does next with its CO2. Second, the GTA does not impose any obligation on Oxy to claim the credit, even if it is available based on Oxy's use of its CO2. As a result, the GTA is missing an essential term of what happens if, as occurred here, Oxy declines to claim an available credit.

SandRidge does not dispute that these two terms are essential. Instead, SandRidge contends that they were such an "obvious part of the deal" that the parties did not need to expressly state them. (Doc. No. 18 at 18–19.) Notably, SandRidge does not support this proposition with any authority. SandRidge compares the GTA to a hypothetical agreement

9

where, "if two parties enter into an agreement for Party A to borrow Party B's car for $10 per day, the parties may not specifically agree that Party B has a car." (*Id.* at 19.) According to SandRidge, this agreement would not fail to include an essential term because Party B having a car is "so self-evident and apparent that it need not be specified." (*Id.*) This hypothetical does not aid SandRidge's case. The relevant comparison with the GTA is not to Party B's ownership of the car but to Party B's promise to lend a car, which is expressly stated in the agreement. From this promise, a court can understand Party B's obligation. That is not the case with the GTA, which lacks any promise by Oxy to use the CO2 in any particular manner or to claim available credits.

### C. Prejudice

Oxy's motion seeks dismissal of SandRidge's complaint with prejudice. SandRidge has not requested leave to amend its complaint. Therefore, the dismissal will be with prejudice.

### IV. CONCLUSION

For the reasons above, the motion to dismiss is **GRANTED**. Accordingly, SandRidge's complaint is **DISMISSED WITH PREJUDICE**.

**IT IS SO ORDERED.**

**SIGNED** at Houston, Texas, on this the 18th day of November, 2015.

THE HONORABLE KEITH P. ELLISON
UNITED STATES DISTRICT JUDGE